**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ) | | |
| SEBASTIAN NJANG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12-cv-0153 (KBJ) |
| | ) | |
| THE WHITESTONE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sebastian Njang, Marco Washington, and Joyce Ejikunle were employed as security guards at a federal government office building in the District of Columbia in 2009, when the events at issue in this lawsuit took place.  All three plaintiffs allege that the private security company that employed them—the Whitestone Group, Inc. ("Whitestone" or "Defendant")—took various actions that constituted illegal race discrimination against them, in violation of 42 U.S.C. § 1981 (*see* Compl., ECF No. 1, ¶ 18 (Count II)), and Njang alone alleges that Whitestone also discriminated against him on the basis of his national origin and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (*see* Compl. ¶ 17 (Count I)). Specifically, Njang and Washington assert that, out of discriminatory animus, their supervisor falsely reported that they had committed fraud, which resulted in their required suitability determinations being revoked, and eventually led to the termination of their employment.  (*See* Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n"),

ECF No. 19, at 1.)[1]  In addition, Ejikunle claims that her supervisor threatened her and reassigned her to a different position with fewer hours and lower pay because of her race, and that Whitestone ultimately terminated her after she refused to relocate.  (*See* Compl. ¶ 15; Pls.' Opp'n at 11–12.)

Before this Court at present is Whitestone's motion for summary judgment under Federal Rule of Civil Procedure 56.  (*See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 18, at 1.)  Defendant's primary argument is that Plaintiffs' claims are time-barred.  (*See* Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), ECF No. 18-1, at 6–8.)  Defendant also contends that, even if the complaint's claims are timely, the doctrine established in *Department of Navy v. Egan*, 484 U.S. 518 (1988), precludes this Court's review of the discrimination claims filed by Njang and Washington (*see id.* at 8–9), and, in any event, none of the plaintiffs can establish prima facie cases of discrimination (*see id.* at 11–14).

As explained fully below, this Court concludes that Whitestone is entitled to summary judgment on Plaintiffs' Section 1981 claims (Count II) because these claims are time-barred due to the six-month contractual limitations period in Plaintiffs' employment contracts.  Njang's Title VII claim (Count I) is not time-barred, but neither party has addressed the particular theory of liability upon which Njang's Title VII claim appears to be based—specifically, the "cat's paw" theory that the Supreme Court articulated in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011)—nor have the parties briefed the critical issues of (1) whether and to what extent *Egan* preclusion applies to Title VII discrimination claims based upon a cat's paw theory, and (2) whether Njang

---

[1] Page numbers herein refer to those that the Court's electronic filing system automatically assigns.

has sufficiently demonstrated proximate cause to survive summary judgment under the analysis set forth in *Staub*.  Accordingly, in its Order of March 31, 2016, this Court ruled that Defendant's motion for summary judgment was **GRANTED IN PART** and **DENIED IN PART**.  The instant Memorandum Opinion explains the Court's reasons for its prior ruling, and it also includes a separate order that requires the parties to provide additional briefing on the material, remaining legal issues discussed below.

## I.   BACKGROUND

### A.   Facts[2]

In February of 2009, Whitestone, a private security contractor, was assigned a pre-existing contract to provide security guards for a federal government office building in Washington, D.C.  (*See* Compl. ¶¶ 7–9.)  Whitestone retained many of the guards the previous contractor had employed, including Plaintiffs Sebastian Njang, Marco Washington, and Joyce Ejikunle.  (*See id.*)  Njang and Washington are both "black male[s,]" and Ejikunle is a "black female[.]"  (*Id.*)  Njang was born in Cameroon and immigrated to the United States in 2000 (*see id.* ¶ 7); Washington and Ejikunle were both born in the United States, although Ejikunle was raised and educated in Nigeria, and returned to the United States in 2002 (*see id.* ¶¶ 8–9).

In connection with their retention as Whitestone employees, Plaintiffs each signed a written employment agreement with Whitestone.  (*See* Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF"), ECF No. 18-2, ¶ 7.)  The agreement included a provision in which the employee agreed "to file all claims or

---

[2] The relevant facts have been gleaned from the complaint and the parties' Statements Of Material Facts, *see* Local Rule 7(h); additionally, all inferences have been drawn in Plaintiffs' favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013).  The facts stated herein are undisputed, unless otherwise noted.

lawsuits in any way relating to employment with the Company no more than six months after the date of the employment action that is the subject of the claim or lawsuit." (*Id.*) The contract also required all of Whitestone's security guards to pass the "suitability determination" that the Federal Protective Services ("FPS"), a division of the Department of Homeland Security, conducts. (*See id.* ¶ 2.)

A few months after Whitestone took over the security contract, it hired Chris Ackerman, a white man, to serve as the project manager for the site. (*See* Compl. ¶ 11.) Plaintiffs allege that Ackerman made a number of discriminatory remarks, including telling Njang that his accent made him sound "like a monkey from Africa[.]" (*See* Decl. of Pl. Sebastian Njang ("Njang Decl."), Ex. 3 to Pls.' Opp'n, ECF No. 19-4, ¶ 7.) Plaintiffs assert that Ackerman also referred to an R&B song as "monkey music" (*id.* ¶ 9), and that he complained that "there were too many Africans and African Americans at the site" (*id.* ¶ 11).[3]

On September 22, 2009, Ackerman asked Washington to come to his office; when Washington arrived, three FPS agents were waiting there for him. (*See* Dep. of Marco V. Washington, Ex. 5 to Def.'s Mot., ECF No. 18-5, at 10.) Ackerman informed Washington that his suitability determination had been revoked. (*See id.*) Washington was required to turn over his credentials and was immediately escorted out of the building. (*See id.* at 11.) The next day, the same sequence of events allegedly happened to Njang. (*See* Dep. of Sebastian Njang ("Njang Dep."), Ex. 4 to Def.'s Mot., ECF No. 18-4, at 9.)

Whitestone says that it determined that several of its employees were

---

[3] Whitestone denies these allegations. (*See* Answer, ECF No. 2, ¶ 12.)

4

fraudulently claiming to have worked additional hours, and that it reported these violations to FPS.  (*See* Memorandum, ECF No. 8, at 2; FPS Investigation Summary, Ex. A to Memorandum, ECF No. 8-1, at 1.)  The FPS conducted an investigation in which "four suspects were determined to be involved in fraudulent time card documentation[,]" including Njang and Washington.  (FPS Investigation Summary at 1.) These negative suitability determinations led to the revocation of Njang's and Washington's security clearances, and their subsequent termination.  (*See* Compl. ¶ 13; Pls.' Separate Listing of Material Facts That Are Genuinely In Dispute ("Pls.' SMF"), ECF No. 19 at 4–6, ¶ 1.)  However, Njang and Washington have consistently denied committing any fraud.  (*See* Njang Decl. ¶¶ 17–19; *see also* Compl. ¶¶ 17–18).

A week after Njang and Washington were removed, Jose Guadarrama, Njang's replacement, approached Ejikunle—the third plaintiff.  (*See* Decl. of Pl. Joyce Ejikunle ("Ejikunle Decl."), Ex. 5 to Pls.' Opp'n, ECF No. 19-6, ¶ 13.)  Ejikunle claims that Guadarrama told her that if she did not start showing support for Ackerman and him, "they would look for some reason to remove [her] from the site, just as they had done with Mr. Njang and Mr. Washington."  (*Id.*)[4]  Ejikunle asserts that this conversation led her to file a race discrimination complaint with the EEOC on October 5, 2009; in that complaint, she alleged that she had been subjected to hostile and threatening treatment on the basis of her race.  (*See id.* ¶ 14; Compl. ¶ 15.)

On October 9, 2009, Guadarrama allegedly told Ejikunle that she was being relocated to another location.  (*See* Ejikunle Decl. ¶ 15.)  According to Ejikunle, she protested this reassignment, which she says would have resulted in reduced hourly pay

---

[4] This statement, too, is disputed.  (*See* Answer ¶ 14.)

and fewer hours.  (*See id.*)  Whitestone claims that Ejikunle did not show up to work at the new location and failed to contact her new supervisor about her new schedule, and as a result, Whitestone treated her as having resigned.  (*See* Def.'s SMF ¶¶ 34–37.) Ejikunle maintains that she never intended to resign and that her termination was involuntary.  (*See* Ejikunle Decl. ¶ 17.)

### B.  Procedural History

Plaintiffs filed the instant employment discrimination lawsuit on January 30, 2012.  The two-count complaint alleges that Whitestone violated Title VII in its treatment of Njang (Count I) and that it violated 42 U.S.C. § 1981 in its treatment of all three Plaintiffs (Count II).

In its motion for summary judgment, which was filed on August 30, 2013, Whitestone contends that judgment should be granted in its favor on both counts.  The motion argues that Count I cannot withstand summary judgment on three grounds: first, because Njang's Title VII claim is time-barred; second, because even if the claim is timely, Njang's attempt to challenge the revocation of his suitability is not justiciable under *Department of Navy v. Egan*, 484 U.S. 518 (1988); and, third, because Njang's allegations fail to state a claim of discrimination under Title VII.  (*See* Def.'s Mem. at 6–18.)  Defendant argues that Count II cannot proceed to trial for these same reasons. (*See generally* Def.'s Mem.)  Defendant's motion has been fully briefed (*see* Pls.' Opp'n; Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 20), and is now ripe for this Court's consideration.

## II.    MOTIONS FOR SUMMARY JUDGMENT UNDER RULE 56

Summary judgment is appropriate if there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under Rule 56, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Although the Court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party[,]" *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C. Cir. 2013) (internal quotation marks, alteration, and citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position, *Anderson*, 477 U.S. at 252. Rather, "there must be evidence on which the jury could reasonably find" for the nonmoving party. *Id.* Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp. Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013)

(quotation marks and citation omitted).  Accordingly, a court's role in deciding summary judgment is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.*  Given "the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent," *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014), this Court reviews a defendant's motion for summary judgment in a discrimination case with a slightly "heightened standard[,]" *Walker v. England*, 590 F. Supp. 2d 113, 133 (D.D.C. 2008) (quotation marks and citation omitted).  However, although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations" with competent evidence showing a genuine issue for trial.  *Id.* at 132–33 (quoting *Morgan v. Fed. Home Loan Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001)).

## III.   ANALYSIS

Plaintiffs' complaint contains two counts.  All three Plaintiffs allege that Defendant discriminated against them on the basis of their race in violation of 42 U.S.C. § 1981.  (*See* Compl. ¶ 18 (Count II).)  Njang alone alleges that Defendant discriminated against him on the basis of his national origin and race in violation of Title VII.  (*See id.* ¶ 17 (Count I).)   As explained below, Plaintiffs' Section 1981 claims must fail because they are barred by the six-month contractual limitations period included in their employment contract with Whitestone.  However, Njang's Title VII claim is different: it is not time-barred under the contractual limitations period because a six-month limitation is unreasonable for Title VII claims.  What is more, insofar as

Njang is challenging his termination, which was allegedly caused by a fraudulent and discriminatory security referral, his claim might not be precluded by the doctrine that the Supreme Court established in *Egan*, but only if the cat's paw theory that the Supreme Court has recognized in *Staub* can apply to discrimination claims that challenge a plaintiff's termination due to a knowingly false and discriminatory referral to security personnel, and only if the facts presented here establish the elements of such a cat's paw claim.[5]   Because neither party has addressed these tricky legal questions, the standards that properly apply to cases such as this one remain to be determined, and this Court cannot say, at this point, whether Njang should be permitted to proceed to trial.   Accordingly, while summary judgment in Defendant's favor as to Plaintiffs' Section 1981 claims (Count II) has been granted, Njang's Title VII claim (Count I) will have to be analyzed further, and on that basis, this Court has concluded that Defendant's motion for summary judgment with respect to Count I must be denied.

> **A.    The Six-Month Contractual Limitations Period In Plaintiffs' Employment Contracts Bars Plaintiffs' Section 1981 Claims, But Does Not Bar Plaintiff Njang's Title VII Claim**

Section 1981 prohibits "racial discrimination in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship[.]"  *Carney v. Am. Univ.*, 151 F.3d 1091, 1092–93 (D.C. Cir. 1998) (internal quotation marks and citation omitted).  Title VII is substantially similar insofar as it prohibits an employer from "discharg[ing] any

---

[5]  The D.C. Circuit accepted and refined the principle that a Title VII claim challenging a knowingly false and retaliatory referral to security personnel is not precluded under *Egan* in its *Rattigan* line of cases.  *See Rattigan v. Holder* (*Rattigan I*), 643 F.3d 975 (D.C. Cir. 2011), *on reh'g*, *Rattigan v. Holder* (*Rattigan II*), 689 F.3d 764 (D.C. Cir. 2012); *Rattigan v. Holder* (*Rattigan III*), 780 F.3d 413 (D.C. Cir. 2015).

individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1). As mentioned above, under the terms of the employment contracts that Plaintiffs Njang, Washington, and Ejikunle entered into with Whitestone, any claims arising under these discrimination provisions, as well as any other "claims or lawsuits in any way relating to employment" must be brought "no more than six months after the date of the employment action that is the subject of the claim or lawsuit."  (Def.'s SMF ¶ 7.)

Notably, the effect of the six-month contractual limitations period in Plaintiffs' employment contracts must be evaluated with respect to Plaintiffs' Title VII and Section 1981 claims separately, because Section 1981 is an "independen[t] . . . avenue[] of relief," *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975), despite the fact that Section 1981 and Title VII generally cover the same discriminatory behavior. Furthermore, while employment contract provisions such as the ones at issue here may serve to shorten "the time for bringing an action" to a lesser period than the time that is prescribed by statute, such a limitation is only enforceable if "the shorter period itself [is] a reasonable period." *Order of United Commercial Travelers of Am. v. Wolfe*, 331 U.S. 586, 608 (1947); *accord Hunter-Boykin v. George Washington Univ.*, 132 F.3d 77, 80 n.1 (D.C. Cir. 1998).  A plaintiff would ordinarily have four years from the date of the allegedly discriminatory act to file a Section 1981 claim in court in the absence of any contractual limitations period, *see Uzoukwu v. Metro. Washington Council of Gov'ts*, 27 F. Supp. 3d 62, 66 (D.D.C. 2014) (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 378–79 (2004)).  The Title VII limitations period is less concrete

due to extensive administrative exhaustion requirements; however, by statute, a charge must be filed with the EEOC within 180 days of the unlawful conduct, and the plaintiff generally cannot file a Title VII law suit until he receives a right-to-sue notification from the EEOC, which he typically can receive no earlier than 180 days after he files his charge.  *See Mabry v. W. & S. Life Ins. Co.*, No. 1:03 CV 848, 2005 WL 1167002, at *3 (M.D.N.C. Apr. 19, 2005).

Thus, to decide the limitations issue that Whitestone has raised in the instant case, this Court must determine whether the six-month limitations period in Plaintiffs' employment contracts is reasonable (and thus enforceable) as it applies to Plaintiffs' Section 1981 and Title VII claims.

1.   <u>Under Applicable Case Law, Six Months Is A Reasonable</u>
<u>Limitations Period For Section 1981 Claims</u>

The courts that have previously considered this question have generally held that six months is a reasonable period of time with respect to Section 1981 claims, both because nothing within Section 1981 indicates that Congress intended for a longer window to bring such a claim, and also because the statute lacks other features that would make filing a claim within six months impracticable, such as an administrative exhaustion requirement.  *See Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1205 (7th Cir. 1992) (upholding the dismissal of a Section 1981 claim as barred by a six-month contractual limitations period because "by enacting [S]ection 1981 without a statute of limitations, Congress implied that it is willing to live with a wide range of state statutes and rules governing limitations of actions under [S]ection 1981."); *see also Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357–59 (6th Cir. 2004) (upholding as reasonable a six-month contractual limitation for employment claims under, *inter alia*, Section 1981,

because six months provided the plaintiff with "ample time to investigate her claim and determine her damages").  This Court agrees with that assessment, because Section 1981 does not contain a requirement that a plaintiff exhaust any administrative remedies, so there are no time-consuming procedural prerequisites that a plaintiff must satisfy before she brings her claim in court.  *See Johnson*, 421 U.S. at 466 (emphasizing that Section 1981 provides plaintiffs with an option to sue that is "independent of the more elaborate and time-consuming procedures of Title VII").

Furthermore, a six-month period within which to file suit is not an inherently unreasonable period of time; indeed, that statutory limitations period is prescribed in various other federal laws, including with respect to duty of representation suits under the Labor Management Relations Act.  *See, e.g., DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169–72 (1983); *see also Taylor*, 966 F.2d at 1205.  As the Seventh Circuit noted, the fact that a six-month limitations period is established by law in other contexts indicates that six months is not so short a period of time as "to work a practical abrogation of the right of action[.]"  *See Taylor*, 966 F.2d at 1205–06.  Thus, consistent with the findings of other courts that have addressed the propriety of a six-month limitations period with respect to employment-related discrimination actions, this Court concludes that the six-month limitations period in Plaintiff's contract is reasonable as applied to Plainitffs' Section 1981 claims.

Turning back to the instant case, it is undisputed here that Plaintiffs filed their Section 1981 claims in court more than six months after the alleged discriminatory acts at issue in this case.  Washington and Njang were terminated on September 22, 2009, and September 23, 2009, respectively (*see* Def.'s SMF ¶¶ 17–19), and Ejikunle was

informed that her absence had been treated as a resignation on October 13, 2009 (*see*

Ejikunle Decl. ¶ 16). Plaintiffs did not file the instant lawsuit until January 30, 2012—

well over two years after the actions about which Plaintiffs complain. Consequently,

Plaintiffs have brought their Section 1981 claims well outside the six-month limitations

period that applies to such claims under the express terms of their employment

contracts, and as a result, Plaintiffs' Section 1981 claims (Count II of the complaint)

are time-barred. *Cf. Thurman*, 397 F.3d at 358–59 (holding that a plaintiff's Section

1981 were time-barred by a six-month contractual limitations period); *Taylor*, 966 F.2d

at 1205–06 (same).

### 2.   Plaintiff Njang's Title VII Claim Is Not Time-Barred

Plaintiff Njang's Title VII claim is subject to a different analysis as far as the

contractual six-month limitations period is concerned. The procedure for bringing a

Title VII claim is far more involved and time-consuming than the procedure for

bringing a Section 1981 claim, and this difference matters when it comes to evaluating

the reasonableness of the contracted-to time limit.

For example, in contrast to the procedures applicable to Section 1981 claims, an

individual alleging a Title VII claim must first file a charge with the EEOC within 180

days after the alleged unlawful employment conduct. *See* 42 U.S.C. § 2000e-5(e)(1).

"The EEOC is then required to investigate the charge and determine whether there is

reasonable cause to believe that it is true." *Occidental Life Ins. Co. of Cal. v. EEOC*,

432 U.S. 355, 359 (1977). If the EEOC determines that there is not reasonable cause,

then it dismisses the charge, *see* 42 U.S.C. § 2000e-5(b), and issues a "right-to-sue"

letter to the plaintiff, notifying the plaintiff that he has the right to bring his own civil

action, *see id.* § 2000e-5(f)(1). *See also id.* (explaining that a plaintiff can request such

a letter only after 180 days have passed since the filing of his EEOC charge). Thus, under the statutory framework, the complainant may bring his Title VII claim in federal court only after receiving a right-to-sue notification from the EEOC, which typically requires waiting at least 180 days after filing his charge with the EEOC. *See id*; *Occidental Life Ins. Co. of Cal.*, 432 U.S. at 361.

Given this expansive and intricate exhaustion requirement, the majority of federal courts that have considered the issue of contractual limitations periods have found that a six-month contractual limit with respect to filing a Title VII claim in court is unreasonable. *See Mazurkiewicz v. Clayton Homes, Inc.*, 971 F. Supp. 2d 682, 689 (S.D. Tex. 2013) (agreeing "with the majority view of the lopsided split in the federal courts on this issue, and hold[ing] that a six-month limitations period is unenforceable against claims that require an EEOC right-to-sue letter"); *see also Cole v. Convergys Customer Mgmt. Grp., Inc.*, No. 12-2404, 2012 WL 6047741, at *4 (D. Kan. Dec. 5, 2012) (finding the "six-months' limitations period . . . unenforceable, unreasonable, and against public policy under federal law as to [plaintiff's] Title VII claims"); *O'Phelan v. Fed. Express Corp.*, No. 03 C 00014, 2005 WL 2387647, at *5 (N.D. Ill. Sept. 27, 2005) (holding that the "employment agreement's six month limit in which to file suit is not enforceable against [plaintiff's] Title VII claim"). To be sure, some courts have found a six-month contractual limitations period to be reasonable and enforceable with respect to Title VII claims. *See, e.g., Thurman*, 397 F.3d at 355, 358 (upholding dismissal of Title VII claims as barred by reasonable six-month contractual limitations period); *Ellison v. DaimlerChrysler Corp.*, No. 3:06 CV 899, 2007 WL 3171758, at *5, *9 (N.D. Ohio Oct. 30, 2007) (dismissing Title VII claim as barred by six-month

limitation period).  However, this Court finds the reasoning of the majority view more persuasive, primarily because such a short limitations period effectively prevents plaintiffs from bringing Title VII claims when the typical time frame for exhausting such claims is considered.

Specifically, under the exhaustion framework described above, a plaintiff usually must wait until 180 days have passed from the filing of the charge with the EEOC to bring his or her claim in court.  *See* 42 U.S.C. § 2000e-5(f)(1); *Occidental Life Ins. Co. of Cal.*, 432 U.S. at 361.  Thus, merely by complying with the administrative exhaustion requirements of Title VII, plaintiffs are typically precluded from bringing their claims in court within six months of the challenged conduct, which means that a six-month limitations period has the practical effect of waiving employees' substantive rights under Title VII.  *See O'Phelan*, 2005 WL 2387647, at *4; *see also Mabry*, 2005 WL 1167002, at *4 ("Because the contractual limitations period would expire before the employee ever had the opportunity to file suit, the employee would be effectively precluded from filing a Title VII or ADA suit"); *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769, 772 (E.D. Mich. 2002) ("Were this Court to uphold the six month limitation of action clause as to Plaintiff's Title VII claim, the EEOC's period of exclusive jurisdiction would have the effect of abrogating Plaintiff's ability to bring a Title VII suit"); *Salisbury v. Art Van Furniture*, 938 F. Supp. 435, 437–38. (W.D. Mich. 1996) (finding six-month contractual limitation unreasonable because it "effected a practical abrogation of the right to file an ADA claim" (internal quotation marks omitted)).  For this reason, this Court finds that a six-month limitations period amounts to "a practical abrogation of the right of action" under Title VII, *Taylor*, 966 F.2d at 1205–06, and

thus is unreasonable as applied to Title VII claims.  Therefore, the Court holds that

Njang's Title VII claim is not time-barred.[6]

### B. Whether Or Not Njang's Title VII Claim Can Survive Summary Judgment Under A Cat's Paw Theory Despite The *Egan* Preclusion Doctrine Requires Further Analysis

Undaunted by the possibility that Njang could successfully mount the contractual

limitations hurdle with respect to his Title VII discrimination claim (he does),

Whitestone also argues, as a threshold matter, that "the Court does not have authority to

hear Njang['s] . . . claim[] because it would require judicial review of the validity of the

decision of an Executive branch agency, the Federal Protective Services, to deny

security and suitability determinations."  (Def.'s Mem. at 1.)  This jurisdictional

argument rests on the contention that "an agency's decision to deny or revoke an

employee's security clearance is precluded from judicial review," *Horsey v. U.S. Dep't

of State*, No. 14-cv-1568, 2016 WL 1118254, at *8 (D.D.C. Mar. 22, 2016)—which is

the well-established doctrine of preclusion that the Supreme Court first articulated in

the case of *Department of the Navy v. Egan*, 484 U.S. 518 (1988).  Whitestone's

preclusion argument is well-founded, because under D.C. Circuit precedent, the *Egan*

---

[6] The Court acknowledges that its conclusion that the six-month contractual limitations period applies differently to different employment-related causes of action places plaintiffs like the ones before the Court today in an awkward position: although they would no doubt prefer to bring all their discrimination claims in court at one time, the application of the six-month window for bringing their Section 1981 claims means that, as a practical matter, their Title VII claims and Section 1981 claims will have to be filed separately.  The Supreme Court addressed this situation in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975).  The *Johnson* Court acknowledged that applying the short limitations period to the Section 1981 claims "press[es] a civil rights complainant who values his [Section] 1981 claim into court before the EEOC has completed its administrative proceeding," *id.* at 465, and the Court suggested that such plaintiff could file his or her Section 1981 claims in federal district court within the contractual limitations period and then move to stay the action pending the EEOC's investigation of the Title VII claim.  *See id.* at 465.  The plaintiff can then later amend his or her complaint to include the Title VII claim after receiving the right-to-sue notification.  *See id.* at 465. Because Plaintiffs in the instant case have taken no such steps to preserve their Section 1981 claims within the limitations period, only Njang's Title VII claim survives as not time-barred.

doctrine is not limited to direct challenges to security clearance decisions; it also extends to judicial review of "employment actions based on denial of security clearance . . . , including under Title VII." *Bennett v. Chertoff*, 425 F.3d 999, 1001 (D.C. Cir. 2005); *see also Ryan v. Reno*, 168 F.3d 520, 524 (D.C. Cir. 1999) (holding that "under *Egan* an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII"). But the D.C. Circuit has also held that *Egan* does *not* preclude judicial review of a Title VII claim that challenges a knowingly false and discriminatory report or referral to the security clearance authorities. *See Rattigan v. Holder* (*Rattigan II*), 689 F.3d 764, 771 (D.C. Cir. 2012). These binding precedents complicate the instant case, because Njang has brought his Title VII claim to challenge the termination of his employment—*not* the allegedly discriminatory referral to the security clearance authorities itself—but he alleges that it was the fraudulent and discriminatory referral that caused the security clearance review that ultimately resulted in the adverse employment action he seeks to challenge.

As explained fully below, this Court concludes that, from the standpoint of *Egan*, there is a salient distinction between a Title VII challenge to an allegedly discriminatory referral to the security clearance authorities (as was the case in *Rattigan*) and a Title VII challenge to a termination that occurs after a security clearance review that was allegedly prompted by a discriminatory referral (the facts of the instant case), which means that Njang is wrong to insist that his Title VII claim is not precluded on the basis of the *Rattigan* exception. But the preclusion argument that Whitestone makes under *Egan* raises another complex legal question, the answer to which is not readily apparent without further briefing: is the *Egan* doctrine unavoidably implicated here

because, when considering Njang's Title VII claim, the Court would necessarily have to evaluate the decisions of the security clearance authorities in order to assess Njang's challenge to his termination (an evaluation that would run afoul of *Egan*), or could a plaintiff in Njang's position rely on the "cat's paw" theory that the Supreme Court recognized in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), to bypass any need for review of the security clearance determination on the grounds that the challenged termination was proximately caused by the discriminatory action of the agent who referred him for a security clearance review?  The parties have not opined on this conceptually difficult, yet material, legal question.  And not only have they failed to address the interplay between *Egan*, *Rattigan*, and *Staub*, it is apparent that neither party has assessed the extent to which the instant record does, or does not, establish the proximate cause that would be necessary to support a discrimination claim under *Staub*'s cat's paw theory, even assuming that Njang's claim is not precluded.

This all means that, although the Court cannot accept Njang's argument that his claim fits within the *Rattigan* exception to *Egan*, there is a possibility that Njang's Title VII claim can nevertheless survive under *Staub*, but only if the cat's paw theory is viable in the security clearance review context and also if Njang has proffered sufficient record evidence to support a discrimination claim based on that theory.  These unresolved legal and factual determinations, which are described in the following discussion, must be analyzed fully before the Court can determine whether Njang can proceed to trial.  Accordingly, this Court has denied Defendant's motion for summary judgment with respect to Njang's Title VII claim without prejudice (*see* Order, ECF No. 22); *see, e.g.*, *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, No.

CV 09-2030 (CKK), 2015 WL 9216686, at *4 (D.D.C. Dec. 17, 2015) (motion for summary judgment denied without prejudice where additional briefing required), and the parties will be ordered to submit supplemental briefs on the significant legal issues that remain to be resolved.

  1. <u>Njang's Challenge To His Termination Does Not Fit Squarely Within</u> <u>The *Rattigan* Exception To *Egan*</u>

  This Court begins its discussion of the complexities of Njang's Title VII claim by dispensing with Njang's contention that the *Rattigan* exception is all that is required to save his discrimination claim from *Egan* preclusion. (*See* Pls.' Opp'n at 19–20.) To understand why *Rattigan* does not apply as Njang asserts, one must first have a firm grasp of the tenets of the preclusion doctrine that the Supreme Court established in *Egan*. In brief, the *Egan* case involved a plaintiff who had been hired by the Navy, contingent upon his obtaining a security clearance. After reviewing the plaintiff's background, the Navy's personnel authorities denied him security clearance, and the plaintiff petitioned the Merit Systems Protection Board for review of that clearance denial. *See Egan*, 484 U.S. at 522. The Board determined that it lacked the authority to review the clearance decision—a conclusion with which the Supreme Court ultimately agreed. The Court's primary reason for holding that the Board could not review the plaintiff's challenge to the security determination was its conclusion that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529. Indeed, according to the Supreme Court, "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative

prediction with confidence." *Id*. Therefore, the *Egan* Court held that an agency's decision to deny or revoke an employee's security clearance is precluded from judicial review. *See id*.

The D.C. Circuit subsequently applied the *Egan* doctrine to bar judicial review of Title VII claims that challenge adverse employment actions stemming from security clearance decisions, as mentioned above. *See Bennett*, 425 F.3d at 1001; *see also Ryan*, 168 at 524 (explaining that, "under *Egan*, an adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII"). The conclusion that the *Egan* bar extends to employment claims that stem from security clearance determinations can be stated quickly, but the D.C. Circuit's rationale is worth pausing to examine. This outcome, the D.C. Circuit explained, "follows inexorably from the manner in which the factfinder resolves Title VII discrimination and retaliation claims[,]" *Rattigan v. Holder* (*Rattigan I*), 643 F.3d 975, 981 (D.C. Cir. 2011), *on reh'g*, 689 F.3d 764 (D.C. Cir. 2012); that is, such cases typically involve application of the familiar three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), pursuant to which "(1) the plaintiff must first prove a prima facie case of discrimination, (2) if the plaintiff does so, then the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the action in question,' and (3) if the defendant meets that burden, the plaintiff must show that the defendant's proffered reasons 'were not its true reasons, but were a pretext for discrimination[,]'" *Rattigan I*, 643 F.3d at 981 (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)). According to the D.C. Circuit, a plaintiff who brings a Title VII claim to challenge an adverse employment action based on the allegedly

discriminatory or retaliatory denial of a security clearance "run[s] smack up against *Egan*" in the course of satisfying the *McDonnell Douglas* requirements, *Ryan*, 168 F.3d at 524, because "determin[ing] whether [or not] the employer's proffered nondiscriminatory reason for the adverse employment action—i.e., that the plaintiff's clearance was denied or revoked on national security grounds—was in fact pretext for discrimination would require the factfinder to evaluate the validity of the government's security concerns[,]" *Rattigan I*, 643 F.3d at 981, which is a forbidden exercise under *Egan*. *See also Bennett*, 425 F.3d at 1003 (explaining that, "[w]hile Bennett claims that TSA's security clearance explanation is pretextual, . . . a court cannot adjudicate the credibility of that claim" because "[t]o do so would require the trier of fact to evaluate the validity of the agency's security determination"). In other words, in the typical Title VII case, the plaintiff "could not challenge the proffered reason's authenticity without also challenging its validity[,]" and "the district court . . . could not proceed with the . . . discrimination action without reviewing the merits of [executive branch]'s decision not to grant a clearance"; therefore, pursuant to *Egan*, "the court [is] foreclosed from proceeding at all." *Ryan*, 168 F.3d at 524.

That said, not all Title VII claims involving security clearance evaluations are foreclosed by *Egan*: the D.C. Circuit has clarified that the *Egan* bar for Title VII claims does not apply to employment challenges that are based on the allegation that one or more co-workers—not trained Security Division personnel—who were motivated by discriminatory or retaliatory animus knowingly filed false reports to the Security Division. *See Rattigan II*, 689 F.3d at 768 ("[W]e adhere to our holding that *Egan*'s absolute bar on judicial review covers only security clearance-related decisions made

by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns."); *see also id.* at 771 (holding that a plaintiff's "Title VII claim may proceed only if he can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false"); *Burns-Ramirez v. Napolitano*, 962 F. Supp. 2d 253, 256 (D.D.C. 2013) (same). In the *Rattigan* line of cases, an FBI employee alleged that "FBI officials retaliated against him in violation of Title VII . . . when, by reporting unfounded security concerns to the Bureau's Security Division, they prompted an investigation into his continued eligibility for a security clearance." *Rattigan II*, 689 F.3d at 765. The investigation cleared Mr. Rattigan, who retained his security clearance and his job; he filed the Title VII lawsuit to challenge the referral of his case to the Security Division as unlawful retaliation. *See id.* at 766.

Significantly for present purposes, the D.C. Circuit held that this type of claim falls outside the *Egan* bar because "*Egan* shields from review only those security decisions made by . . . employees . . . trained and authorized to make security clearance determinations, and not the actions of . . . other . . . employees who, like Rattigan's . . . supervisors, may from time to time refer matters to the [Security] Division." *Id.* (internal quotation marks and citation omitted). The Court explained that this limitation was consistent with the rationale of *Egan*, which was that "certain discretionary security decisions are . . . committed to the Executive's expert judgment." *Rattigan I*, 643 F.3d at 983. Furthermore, to mitigate the risk that Title VII actions such as these might chill the reporting of important security concerns, the court "impose[d] a scienter requirement—a Title VII claimant may proceed [with a *Rattigan* claim] 'only if he can

show that agency employees acted with retaliatory or discriminatory motive in reporting or referring information that they *knew* to be false.'" *Burns-Ramirez*, 962 F. Supp. 2d at 256 (emphasis in original) (quoting *Rattigan II*, 689 F.3d at 771).  The Circuit also subsequently determined that both the "[m]otive and knowing falsity must unite in the same person"; that is, the same employee who makes the report with the prohibited motive must also know that the report is false.  *Rattigan v. Holder* (*Rattigan III*), 780 F.3d 413, 416 (D.C. Cir. 2015).  Thus, a plaintiff seeking to bring a *Rattigan*-based Title VII claim to challenge a security referral must show that: (1) the reporting employee had a discriminatory or retaliatory motive for reporting the plaintiff or referring false information about him, and (2) the reporting employee knew that the report or referral of information was false.  *See Rattigan II*, 689 F.3d at 771.

       With all this in mind, Njang argues that his Title VII claim is not precluded under *Egan* because it falls squarely within the *Rattigan* realm.  (*See* Pls.' Opp'n at 19–20.)  To be sure, Njang appears to have offered sufficient evidence to raise a genuine question regarding the fact-based issue of whether his supervisor (project manager Ackerman) orchestrated knowingly false allegations regarding Njang's participation in time card fraud for racially discriminatory reasons and then referred Njang to the Federal Protective Services division for a suitability review on this basis.  *See infra* Part III.B.2.  But for *Egan* purposes, the fit between the facts of the instant case and the facts of *Rattigan* is not sufficiently exact.  This is because the only adverse employment action that the plaintiff in *Rattigan* challenged was *the false security referral itself*, *see Rattigan I*, 643 F.3d at 981 (explaining that "[i]n contrast to the claims raised in *Ryan*, *Bennett*, and *Egan* itself, Rattigan's claim implicates neither the denial nor revocation

of his security clearance nor the loss of employment resulting from such action"), and no *Egan* concerns were implicated under such circumstances because the sole act to be evaluated by the Court was the allegedly discriminatory referral—an act that occurred prior to the unreviewable security clearance determination.  By contrast, Njang appears to be challenging his *termination*, which occurred *after* the security clearance review (*see* Compl. ¶ 1 (stating that "Plaintiffs bring this action against their former employer for firing them")), and although the termination allegedly stemmed from a knowingly false and discriminatory security referral by Ackerman (*see* Pls.' Opp'n at 20 ("Plaintiffs in this case clearly are challenging the actions of Defendant's agents in falsely reporting to the Federal Protective Service that Plaintiff[] Njang . . . encouraged employees to [commit time card fraud].")), Njang's Title VII does conceivably implicate concerns about evaluating a security clearance decision in a manner that the claim in *Rattigan* did not.  Thus, the *Rattigan* cases do not provide an obvious escape from *Egan* preclusion for Njang, insofar as they do not establish that a claim challenging a *termination* based on a discriminatory security referral evades the *Egan* bar on Title VII claims that the D.C. Circuit recognized in *Ryan* and *Bennett*.[7]

---

[7] A legal system that permits a suit by a plaintiff who brings a Title VII claim to challenge a knowingly false referral to security authorities that does *not* result in any further harm to the plaintiff—as in *Rattigan*—but prevents a suit by a Title VII plaintiff who suffers actual harm (termination) as a result of a knowingly false referral to security authorities—the allegation here—is manifestly strange.  But the oddness of that outcome is somewhat mitigated when one considers another significant difference between the facts of *Rattigan* and the claims at issue here: Rattigan's claim was brought under Title VII's antiretaliation provision, 42 U.S.C. § 2000e-3(a), while Njang's claim was brought under Title VII's substantive antidiscrimination provision, 42 U.S.C. § 2000e-2(a).  The D.C. Circuit has long recognized that the antiretaliation provision "'cover[s] a broad range of employer conduct' that extends beyond the statute's substantive antidiscrimination provision[,]" *Rattigan I*, 643 F.3d at 986 (alteration in original) (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011)), and this greater breadth manifests itself in the wider range of materially adverse actions that a Title VII plaintiff can challenge as retaliatory.  Thus, a plaintiff who brings a typical discrimination claim can only contest as sufficiently adverse an action that caused "a significant change in [his] employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir.

2.      Njang's Title VII Claim Appears To Rest On A Cat's Paw Theory, But Neither Party Has Briefed How Such a Claim Interacts With The *Egan* And *Rattigan* Doctrines Or Whether The Record Evidence Establishes The Requisite Proximate Cause

Notwithstanding the unavailability of the *Rattigan* path as a gateway past the *Egan* bar for Njang's Title VII challenge to his termination, this Court notes that Njang's discrimination claim is somewhat atypical, insofar as he does not appear to contend that the decision of the FPS security review personnel was a pretext for discrimination, or that the person who allegedly acted with discriminatory animus—his manager, Ackerman—was the person who made the decision to revoke his clearance, necessitating his firing.  Instead, Njang asserts that the suitability review undertaken by potentially well-meaning security staff would not have occurred but for the knowingly false referrals that Ackerman made with discriminatory intent.  (*See* Pls.' Opp'n at 9 ("Njang insists that Defendant orchestrated [false] statements against him . . . in order to . . . replace [him] with [a] Caucasian[] . . . .")  This kind of claim is based on a "cat's paw" theory of liability, which the Supreme Court has accepted as a means of establishing an employment discrimination claim.  *See Staub*, 131 S. Ct. at 1191.[8]  In

---

2009) (internal quotation marks and citation omitted).  By contrast, "the antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment[,]" *Thompson*, 562 U.S. at 174 (internal quotation marks and citation omitted), and, indeed, a Title VII plaintiff alleging retaliation can challenge any action "that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination[,]'" *Rattigan I*, 643 F.3d at 986 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  Thus, while the *Rattigan* court concluded that a reasonable jury could find that the security referrals themselves—regardless of any subsequent investigation—could dissuade a reasonable worker from bringing a discrimination claim, *see id.*, it is highly doubtful that a false referral, on its own, would qualify as a significant change in employment conditions for discrimination purposes.  Consequently, if Njang attempted to shoehorn his Title VII action into the *Rattigan* doctrine by restyling his claim as a challenge to Ackerman's allegedly discriminatory referral alone, he would likely fail to state a claim for discrimination under Title VII.

[8] The term "cat's paw" derives from one of Aesop's fables in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing."  *Staub*, 131 S. Ct. at 1190 n.1.

*Staub v. Proctor Hospital*, which concerned an employment discrimination claim brought under the Uniformed Services Employment and Reemployment Act (USERRA), 38 U.S.C. § 4311, the Supreme Court held that liability exists under a cat's paw theory where "a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and . . . that act is [the] proximate cause of the ultimate employment action," even if the supervisor was not the official who made the decision to take adverse action.  131 S. Ct. at 1194 (emphasis omitted).[9]  The *Staub* Court explained that proximate cause in this context "requires only some direct relation between the injury asserted and the injurious conduct alleged," such that "the exercise of judgment by the [subsequent] decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm."  *Id.* at 1192 (internal quotation marks and citation omitted).  Thus, the cat's paw theory applies when "the company official who makes the decision to take an adverse employment action . . . has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else."  *Id.* at 1191; *see, e.g., Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015); *Swann v. Office of the Architect of the Capitol*, No. 13-CV-01076 (CRC), 2016 WL 2733099, at *5 (D.D.C. May 10, 2016).

    What complicates matters for the purpose of the instant analysis is the fact that *Staub*-style employment discrimination claims do not press the traditional argument that the decision maker's proffered reason was a pretext for discrimination; instead, this

---

[9] The *Staub* Court noted that USERRA "is very similar to Title VII," *Staub*, 131 S. Ct. at 1191, and courts in this jurisdiction have applied *Staub*'s analysis to Title VII claims.  *See, e.g., Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 n.1 (D.C. Cir. 2015); *Gibbs v. Wash. Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 127 n.4 (D.D.C. 2014).

theory of Title VII liability maintains that another agent "committed an action based on discriminatory animus that was intended to cause, and did in fact cause, [the challenged] adverse employment [action]." *Staub*, 131 S. Ct. at 1193. Therefore, it is not clear how a cat's paw claim interacts with the traditional pretext-based analysis under *McDonnell Douglas*. *See Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) (acknowledging, but not resolving, the "uneasy marriage" between a *Staub* analysis and *McDonnell Douglas*); *see also Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 n.3 (6th Cir. 2014); Benjamin Pepper, *Staub v. Proctor Hospital: A Tenuous Step in the Right Direction*, 16 Lewis & Clark L. Rev. 363, 385 (2012) (identifying the interaction of *Staub* and *McDonnell Douglas* as an open question). And, consequently, it is also unclear whether a Title VII claim challenging a termination of employment that was allegedly caused by a discriminatory referral to security clearance authorities can proceed despite *Egan*; in other words, it has yet to be decided whether *Egan* preclusion applies to a cat's paw–based Title VII claim that challenges a termination that results from the revocation of a security clearance, given that, as explained above, the D.C. Circuit considered *Egan* to be applicable to Title VII claims precisely because of the specific intersection of *Egan* and *McDonnell Douglas*.

Neither party here has recognized that Njang's claim follows a cat's paw structure, much less spoken to the question of whether and to what extent *Egan* precludes Title VII claims involving the revocation of a security clearance in which the challenge to the employee's termination is premised on a cat's paw theory. In addition, and perhaps even more fundamentally, having not recognized the potential applicability of *Staub*, the parties here have not evaluated or addressed the question of whether the

established facts in the instant record are sufficient to demonstrate the elements of a *Staub* claim—i.e., (1) that a supervisor performed an act of discriminatory animus; (2) that the act was intended to cause an adverse employment action; and (3) that the act was the proximate cause of the ultimate adverse action, *see Shinabargar v. Bd. of Trustees of Univ. of D.C.*, No. 15-CV-330 (BAH), 2016 WL 393180, at *9 (D.D.C. Feb. 1, 2016)—even assuming that such claim can proceed as a matter of law.

Notably, this Court finds that the record evidence in this case *does* raise a genuine issue of fact regarding the first two *Staub* elements, insofar as a reasonable jury could find that Ackerman's referral of Njang to the Federal Protective Services was made with a discriminatory intent and was knowingly false, and was intended to result in his termination.  Specifically, Njang asserts that Ackerman made racist comments and revealed his preference for white employees over black employees on numerous occasions.  A sworn declaration that Njang has attached to his Opposition brief catalogues these racially insensitive remarks.[10]  And given this testimony, there would

---

[10] (*See* Njang Decl. ¶ 7 ("In the presence of Mr. Grimm and Mr. Buchner, Mr. Ackerman accused me of not being able to speak clearly and asserted that I spoke like a 'monkey from Africa' and that I needed a translator for him to understand me.  Mr. Ackerman said that he was uncomfortable working with people who could not speak English, and that he could not understand why I was named supervisor on the site.  He accused me of not being able to speak English because of my accent."); *id.* ("A few days later, Mr. Ackerman and I were discussing business in the lobby at 810 7th St. and he said that I needed to talk more clearly because he did not understand me."); *id.* ("I was so upset about Mr. Ackerman's remarks I sent a complaint to the President of the Company on 7/18/09 wherein I objected to the discriminatory treatment by Mr. Ackerman."); *id.* ¶ 8 ("[In July 2009,] Mr. Ackerman told me that I needed to name an assistant to cover when I [was] not at work, and he need[ed] to have questions answered.  I told him that I would name Marco Washington (African American) as my assistant . . . because he ha[d] filled in as my assistant in the past and ha[d] extensive experience in security work.  Mr. Ackerman told me that he did not want Mr. Washington to be my assistant because he claimed that we needed diversity on the workforce.  I understood that as referring to Mr. Washington being black.  Mr. Ackerman pressed me to name Ivan Guadarrama (Caucasian), who had only been an officer since March or April[] 2009 and had no supervisory background and no security experience. . . . I refused to name Mr. Guadarrama to be my assistant . . . ."); *id.* ¶ 9 ("I recall having a supervisor's meeting in August 2009 at my site [at] about 8:30 in the morning and Mr. Ackerman was meeting with myself and Mr. Buckner (African American) in the lobby.[]  Mr. Buckner's cell phone rang and Mr. Ackerman commented to Mr. Buckner: 'Can we cut off that monkey music?  That is so unprofessional[.]'  The music was from a popular African American singer by the name of Jamie Foxx.").)

appear to be ample evidence to support a conclusion that Ackerman had a discriminatory motive when he referred Njang for a suitability review.

In addition, the record also contains testimony that could support a jury finding that the fraud accusations made against Njang were false, that Ackerman referred the fraud allegations to FPS knowing that they were false, and that Ackerman made the referral with the intent to get Njang fired. To begin with, Njang flatly denies committing any time card fraud. (*See* Pls.' Opp'n at 20; *see also* Njang Decl. ¶ 17 (testifying that the allegations of fraud that were made against him were false).) Moreover, although two Whitestone employees testified that they had witnessed Njang instructing another employee to falsify her time card (*see* Njang Decl., Attach. 3, ECF No. 19-4, at 18–19), the schedule sheets that Njang has submitted as evidence appear to support Njang's contention that his accusers were not even present at the relevant time, and thus could give rise to a reasonable inference that the fraud allegations were fabricated (*see id.*, Attach. 4, ECF No. 19-4, at 21–22). Furthermore, Ejikunle's declaration strongly implies that Ackerman knew false charges regarding time card fraud were being made against Njang, and that it was Ackerman who arranged for Njang's accusers to report these false claims in order to bring about Njang's termination. According to Ejikunle, after Njang was fired, one of the employees who had accused Njang at Ackerman's behest threatened that "if [she] did not start showing support for Ackerman . . . they would look for some reason to remove [her] . . . , just as they had done with Mr. Njang and Mr. Washington." (Ejikunle Decl. ¶ 13.) All told, then, a reasonable jury could find on this record that Ackerman had a discriminatory motive and was behind the fabrication and referral of the fraud claims against Njang

(thus, he knew the accusations were false), in order to prompt the suitability investigation that led to Njang's firing.[11]

Given all that, this Court is confident that any heightened scienter requirement that might be necessary to prevent clearance-related Title VII claims from chilling good faith security referrals in the cat's paw context is at least arguably present in this case. *See Rattigan II*, 689 F.3d at 770.  Thus, what remains to be assessed for the purpose of summary judgment is whether *Egan* nevertheless precludes cat's paw–based Title VII termination claims stemming from knowingly false and discriminatory referrals to security clearance authorities (i.e., whether Njang's cat's paw theory of liability is viable as a matter of law), and, if such claims can proceed despite *Egan*, whether the evidence here is such that a reasonable jury could find that the revocation of Njang's suitability clearance was, in fact, proximately caused by Ackerman's discriminatory

---

[11] Defendants' primary response is to argue that this Court should disregard Njang's own sworn testimony for several reasons. (*See* Def.'s Reply 5–6.)  This Court concludes that none of these reasons is persuasive.  First of all, the Court does not perceive a fatal contradiction between Njang's declaration and his prior sworn deposition testimony (*see* Def.'s Reply at 6 (arguing that Njang initially denied knowing what prompted the FPS investigation and his suitability revocation, but later stated in his declaration that false reports submitted by Whitestone employees prompted the investigation (citing Njang Dep. at 9, 10; Njang Decl. ¶ 20))), because any discrepancy between Njang's two statements is easily accounted for by considering the scope of the questions posed in the two different settings—i.e., the statements in Njang's deposition speak to whether he knew about the reasons behind his suitability revocation *at the time it occurred* (*see* Njang Dep. at 10 ("Q: Do you know why you were forced to surrender your credentials to the FPS Officers? A: On that September 23, 2009, I didn't know why they asked me to surrender my credentials . . . .")), while the declaration statement Defendant points to discusses what Njang believed *at the time of the declaration* (*see* Njang Decl. ¶ 20 ("Now I believe that Ackerman used the falsified statements prepared by Guadarrama, and Officers Schorr and Smith to get our suitability revoked.")).  Furthermore, because Njang's statement that "[t]o date, [he had] never been told why [his] credentials were taken from [him]" (Njang Decl. ¶ 16) does not contravene his later statement that he believed Ackerman was behind the revocation, Njang's declaration is not internally contradictory.  (*See* Def.'s Reply at 6.)  And Whitestone also fails to establish that Njang's theory that Ackerman knowingly falsely reported information to the FPS is not supported by personal knowledge and thus should be disregarded.  It is true that Njang makes this assertion in his declaration (*see* Njang Decl. ¶ 20), and that his own knowledge of Ackerman's mental state is limited, but the falsity contention is supported by other record evidence: specifically, Ejikunle's sworn declaration that Guadarrama threatened that he and Ackerman would "look for some reason to remove [her] from the site, just as they had done with Mr. Njang" (Ejikunle Decl. ¶ 13).  Therefore, there is ample factual basis for concluding that Ackerman knowingly reported false information to FPS in order to initiate FPS's investigation of Njang, and a reasonable jury could so find.

referral (i.e., whether the proximate cause element of the *Staub* analysis has been met). In this regard, then, while Njang may very well have the kernels of a successful Title VII claim at the Rule 56 stage, this Court needs more elaboration from the parties before it can determine with certainty whether Njang's claim can proceed to trial.

## IV.   ORDER

For the reasons explained above, Plaintiffs' Section 1981 claims are time-barred, and Njang's Title VII claim must be analyzed further.  Accordingly, this Court has already **GRANTED IN PART and DENIED IN PART** Defendant's motion for summary judgment. (*See* Order, ECF No. 22 (granting in part and denying in part ECF No. 18).)  It is hereby

**ORDERED** that Defendant Whitestone shall submit a renewed motion for summary judgment, along with a memorandum of law that specifically addresses the issues of (1) whether *Egan* precludes Njang's Title VII claim as a matter of law, and (2) whether Njang's Title VII claim survives summary judgment under a cat's paw theory. Defendant's memorandum, which shall be no more than 25 pages, shall be filed **on or before June 17, 2016**, and shall evaluate Njang's claim under the cat's paw framework articulated in *Staub* (especially with respect to *Staub*'s proximate cause requirement), and also analyze how a cat's paw claim intersects with *Egan* and the D.C. Circuit cases that interpret *Egan*'s applicability to Title VII claims.  Plaintiff Njang shall file a

responsive brief of no longer than 25 pages **on or before July 8, 2016**; and any reply

brief, which shall be no longer than 15 pages, shall be filed **on or before July 22, 2016**.


DATE:  May 18, 2016                    *Ketanji Brown Jackson*
                                       KETANJI BROWN JACKSON
                                       United States District Judge